## STATE OF MICHIGAN,

In July Term, 1845.

PRESENT:

HON. EPAPHRODITUS RANSOM, CHIEF JUSTICE.
HON. CHARLES W. WHIPPLE, ⎫
HON. ALPHEUS FELCH,      ⎬ JUSTICES.
HON. DANIEL GOODWIN,     ⎭

2d 155
f149 ¹238

---

## HIRAM SMITH, ADNA LEWIS AND ELISHA THORNTON, v. SAMUEL BARSTOW.

A contract, the consideration or object of which is in violation of law, is void, and a court of justice will not lend its aid to enforce it.[*]

But a subsequent contract, if unconnected with the illegal act, and for a new consideration, is valid and will be enforced, although it may have grown out of the illegal transaction, and the party to whom the promise was made may have had a knowledge of it.

Assumpsit upon a promissory note for $1,000, made by the defendants and payable to the plaintiff. The origin and consideration of the note were as follows: The Farmers' Bank of Homer, an institution organized under the general banking law of this state, (S. L. 1837, p. 76,) drew certain drafts, on one W., to the amount of $12,000, payable four months after date, which drafts W. was induced to accept for the accommodation of the bank, by its depositing with him $15,000 of its own bills, to secure and indemnify him for such acceptances. The drafts were negotiated, and, the bank failing to provide for their payment at maturity, were dishonored. Afterwards, the defendants, (who, with others, were directors of the bank where

---

[*] See *Bank of Michigan* v. *Niles*, 1 Doug. Mich. R. 401.

the drafts were drawn, and as such individually liable for its debts, according to the terms of the general banking law,) in consideration of the delivery to them by W. of the $15,000 of bills of the bank deposited with him as above mentioned, made and delivered to the plaintiff the note in question, and also assigned to him certain other securities, upon the *trust,* that he should collect the moneys due and to become due thereon, and apply the same to the payment of the drafts drawn upon W., and in indemnifying W. against his acceptances thereof, &c. *Held,* that, admitting the unconstitutionality of the general banking law, in so far as it purports to confer corporate powers, and the consequent illegality of the drafts and bills, yet, that the note and trust were untainted by such illegality, but were a new and separate transaction based upon the fact, that the holder of the drafts had advanced a full consideration for them, which in justice and equity ought to be paid to him; and that the consideration of the note, viz: the delivery by W. to the defendants of the bills of the bank, and the object of the note and trust, viz: to provide for the payment of the drafts, were legal and valid.

*Held,* also, (affirming *Rice* v. *Wheelock,* 1 Doug. Mich. R. 267,) that the plaintiff was entitled to recover on the note, without showing that W. had been damnified by reason of his acceptances of the drafts.

· ERROR to Calhoun Circuit Court. Assumpsit. Barstow was the plaintiff below, and declared against Smith, Lewis and Thornton, as makers of a promissory note for $1,000, dated April 15, 1841, and payable to him, with interest, on the first day of March, 1842, at the Farmers and Mechanics' Bank of Michigan. Plea, the general issue.

In defence of the action, the defendants below gave in evidence a certain declaration of trust, executed to them by Barstow, on the day of the date of the note, which recites that on the 5th day of August, 1838, Asahel Finch, Jr. being cashier of the Farmers' Bank of Homer, in this state, as such cashier, made two drafts or bills of exchange of $6,000 each, on John A. Welles, then cashier of the Farmers and Mechanics' Bank of Michigan at Detroit, payable at the Troy City Bank, *four months after date;* that the Farmers' Bank of Homer having no funds in the hands of Welles, or of the bank of which he was cashier, Finch applied to Welles to accept the drafts,

promising to provide for their payment, and, to secure and indemnify him for such acceptances, deposited with him $15,000, nominal value, of the bills of the Farmers' Bank of Homer; that, thereupon, Welles accepted the drafts for the accommodation of said bank; that the drafts were not provided for or paid, but were dishonored, and were then in the hands of the attorneys of the Troy City Bank, the holders, for collection; that Smith, Lewis and Thornton, (the defendants below,) were, with other persons, directors of the Farmers' Bank of Homer, when the drafts were drawn; that Welles had, on the day of the date of the instrument, delivered to them the bills of said bank deposited with him; and that, in consideration thereof, they had, on the day of the execution of the instrument, assigned to Barstow certain mortgages, and had also executed to him certain other securities, of which the note in question was one.   The instrument then proceeds to declare the trusts upon which such securities were delivered to and held by Barstow, viz:

1. To collect and receive the moneys due and to become due upon said securities:

2. To apply the money collected or received thereon, in payment of the two drafts, and in indemnifying Welles against his acceptances thereof:

3. To assign the securities to Welles for his own use, whenever he should pay or take up the drafts, so that neither the Farmers' Bank of Homer, nor the defendants, as directors or stockholders thereof, should be longer liable; or, to the Troy City Bank, whenever that bank should accept them in payment.

The instrument further provides that the defendants, with the written consent of Welles, might modify the trusts in any way not inconsistent with their main object, which is stated to be to indemnify Welles against his acceptances.

It was admitted on the trial that the Farmers' Bank of Homer was an institution organized under the general banking law of this state, (S. L. 1837, p. 76;) that the drafts had never been paid; and that a suit had been brought upon them by the Troy City Bank, and was then pending in this court.

Upon this evidence, the counsel for the defendants below requested the court below to charge the jury, that the plaintiff was not entitled to recover on the note,

1. Because it was given for an illegal consideration and object, viz: to provide means for the payment of bills or notes issued by the Farmers' Bank of Homer, an institution which had no legal existence, the law under which it was organized being unconstitutional and void.

2. That if the bank had a legal and constitutional existence, the drafts were illegal, in not being payable on demand without interest.

3. That the note was made and delivered, and the other securities were assigned to the plaintiff below, for the purpose of indemnifying Welles, and, unless the jury believed that he had been damnified by reason of the acceptances, the plaintiff below was not entitled to recover.

The court refused so to instruct the jury, but charged against the defendants below on the several points presented. The defendants below excepted, and a bill of exceptions having been signed, removed the cause into this court by writ of error.

*T. Romeyn,* for the plaintiffs in error.

*S. Barstow,* in person.

Goodwin, J. delivered the opinion of the Court.

Upon the exception taken to the refusal of the court below to charge the jury as requested on the first point, the plaintiffs in error now insist—

First: That the consideration of the note was the delivery to them by Welles of the bills of the Farmers' Bank of Homer, deposited with him to secure and indemnify him against his acceptances, and that the bills being illegal by reason of the unconstitutionality of the general banking law, such consideration was illegal, and the note was therefore void.

Secondly: That the drafts were illegal for the same reason; and that the object for which the note was made and the trust created, was to provide for the payment of the drafts, and that the trust was illegal and the note therefore void.

The counsel for the defendant in error insists, that the first question is not raised by the exception, because the charge sought from the court was, that the note having been given to provide means for the *payment of bills or notes* issued by an institution having no legal existence, was, therefore, void; and that the note was not given to provide for the payment of the bank bills delivered.

The office of a bill of exceptions is to bring before the court legal propositions decided, which do not appear on the record; and enough of the facts upon which the propositions arise should be given, to show their materiality. At the same time, no question which might arise on the facts, will be noticed by the court of review, that is not presented or embraced in the exception.   When a proposition is presented, the party is not bound by the reasons urged in argument in its favor.   But when the proposition is itself restricted by the party to a single point arising in the case to which it is applicable, it may well be doubted whether the party should be permitted to extend it to another, which he has excluded, and to which, from the facts of the case to which he applies it, it has no relation.   Here the drafts were the instruments for which the means of payment were provided; and not the bank bills surrender-

ed to the plaintiffs in error. As, however, the first clause of that part of the charge would embrace the point, and the counsel seems to consider the restriction only as one of several reasons that might be urged under the broad language of that clause, it will be considered.

The drafts, and the bills which were delivered by Welles to the plaintiffs in error, are alleged to be illegal,— (1.) For the reason that the Farmers' Bank of Homer had no corporate existence, under the decision of this court in *Green* v. *Graves*, (1 Doug. Mich. R. 351,) declaring the general banking law of this state under which it was organized unconstitutional, in so far as it purported to confer corporate powers, and was, consequently, illegally assuming corporate functions, in drawing and issuing them: and (2.) It is also alleged that they were in violation of the act restraining private banking, and were therefore also illegal and void. These positions are met by denying them as conclusions resulting from the absence of corporate powers, and the invalidity of the act assuming to confer them; and it is also further contended, that even if they were just conclusions, and the transaction of the making and acceptance of the drafts, and the deposit of the bills, was illegal, yet, that the subsequent transaction was not affected by it, and the trustee may nevertheless recover. As this transaction appears from the bill of exceptions, it is proper first to consider the view last suggested; for, if it be correct, a consideration of the others becomes immaterial. Assuming that the conclusions resulting from the unconstitutionality of the law under which the Farmers' Bank of Homer was organized are correct, as to bills and drafts in question, was the note given for an illegal consideration and object? In other words, was the trust created in the plaintiff below, invalid for the reasons alleged? Or, was this transaction free from the supposed illegal taint?

The principle is not controverted that contracts of which the consideration or object are in violation of law, will not be enforced. Courts of justice will not aid the parties to such contracts to carry them into effect. They are held void ; and it is a settled maxim that *ex turpi causa actio non oritur.* At the same time, it is also laid down in the elementary works, in regard to subsequent contracts, that if they be unconnected with the illegal act, and for a new consideration, they are valid, and will be enforced, although they may have grown out of the illegal transaction, and the party to whom the promise was made, may have had a knowledge of it. The cases are somewhat numerous on this subject, and the line of demarkation between those which are held tainted with the illegality of the original transaction, and those which are not, does not seem very distinctly defined. In the case of *Armstrong* v. *Toler,* 6 Pet. Cond. R. 298, the subject was much considered, and Chief Justice *Marshall,* in giving the decision of the court, after stating the general principle as to contracts, the consideration of which is illegal, remarks : " How far this principle is to affect subsequent, or collateral contracts, the direct and immediate consideration of which is not immoral or illegal, is a question of considerable intricacy, on which many controversies have arisen, and many decisions been made." He reviews many of the cases on the subject, and the general distinction is recognized between contracts which are directly and those which are not directly connected with the illegal act. The case came before the court on exceptions to a charge of the circuit court ; and the charge, which stated this distinction clearly and applied it in the case then before the court, is sustained.

In the case of *Faikney* v. *Reynous,* 4 Burr. 2069, the plaintiff and one Richardson had been engaged jointly in transactions in violation of the act of Parliament to pre-

vent stock jobbing, and the plaintiff had paid £3,000 losses incurred in those transactions, and which, under the act, could not have been recovered : a bond was given, at the procurement of Richardson, for the one half of this amount, upon which the suit was brought. Upon a plea setting up the facts, it was insisted that the bond was illegal and void, being for money paid in violation of the act. The plea was overruled ;—the court holding that the payment of money for the use of another, although it was upon a transaction *malum prohibitum*, was a good consideration for the bond, and that the fact that it was applied to that use, was immaterial.

In *Petrie et al. Executors of Keeble* v. *Hannay*, 4 T. R. 418, Keeble and the defendant had been jointly engaged in stock jobbing transactions, and, in them, incurred a liability to their broker, for a part of which Keeble made a draft on the defendant, which he accepted, but which, not being paid by him, was afterwards paid by the executors of Keeble, the deceased partner, and an action brought against the defendant, the acceptor, for the money. The case of *Faikney* v. *Reynous* was relied on and the action sustained. The money was paid on an illegal transaction, but the new security, the acceptance, was equivalent to a subsequent request to pay the money, and an express promise to repay it.

These cases are cited by Chief Justice *Marshall*, as of authority, in the case of *Armstrong* v. *Toler*, above referred to.

In *Tenant* v. *Elliot*, 1 Bos. & Pull. 3, the defendant, as an insurance broker, procured an insurance for the plaintiff, of his vessel, for an illegal voyage. The vessel was lost, and the broker recovered the money on the policy. Upon being sued for it by the plaintiff, he set up as a defence the illegality of the plaintiff's contract upon which the money was recovered; but this was held to be no bar.

In the case of *Farmer* v. *Russell*, 1 Bos. & Pull. 295, the same doctrine was held.   B. and C. were engaged in an illegal transaction, upon which B. paid to A. for C. and to be paid to him, a sum of money, which A. not paying, C. sued him, and it was held that he should recover, and that A.'s contract, though for the money which had been paid by B. on the illegal transaction, yet arose from the money paid him, and was unconnected with, and not tainted by the illegality.   In this case those of *Tenant* v. *Elliot* and *Faikney* v. *Reynous,* are both cited as authority. This is also cited by Chief Justice *Marshall,* in the opinion above referred to.

These cases, while they sustain, illustrate the rule laid down in the elementary writers, and in *Armstrong* v. *Toler.*

There is another class of cases in which, although money may have been paid on an illegal contract, as its consideration, yet a new contract to repay it is held valid.   Thus, where money is lent or advanced on a security which is declared void by the provision of law, yet a new security for the money paid, or a new promise to pay it, is sustained.   The most familiar of this class is where there has been a usurious loan, and a security taken, which is void in consequence of the usury.   A subsequent security for, or verbal promise to pay the money lent, excluding the usury, is valid, and will sustain an action.   The money is regarded as due in equity and good conscience, although having been paid in a transaction of which courts will take no cognizance ; and a subsequent promise to pay it is deemed valid.   The doctrine upon this subject is reviewed, and the cases collected in *Early* v. *Mahan,* 19 John. R. 147.

There is another class of cases which involve the same principle.   I refer to that class in which it is held that an obligation or promise to indemnify against a previous ille-

gal act, from which the party has derived benefit, is valid. Any agreement with a sheriff or other officer, to indemnify him against a prospective or contemplated illegal act, is held void. Yet, if a party in custody of a sheriff for a debt, is permitted by him to escape, and the sheriff is compelled to pay the debt, and the party afterwards promise to repay it, this promise is valid, notwithstanding the illegal act to which both were parties.

In all these cases it is to be observed that the new and distinct contract in no manner tended to further or promote the illegal transaction, or the violation of the law. The great principle upon which all such contracts are held invalid and not to be supported in courts of justice is, that violations of law will not be aided or promoted by courts; and agreements which have that object or tendency, will not be countenanced by them.

Let us, then, proceed to consider the questions here presented in connection with the rule as established and illustrated by the cases.

First: Was the consideration of the note, or the trust created in the hands of the plaintiff, illegal? In the declaration of trust this is stated to be the delivery to the defendants below, of the bills of the Farmers' Bank of Homer, which had been deposited with Welles. These, says the counsel, were illegal, because issued in the usurped exercise of corporate powers. They were delivered to the defendants below, not in the ordinary course of business as a circulating medium, but under a special agreement. For what purpose were they delivered to them? It is assumed that it was for the purpose of circulation. This, however, does not appear. It does appear that they were the directors of the association by which the bills were made and put into the hands of Welles: and, if directors, they had the management, (either themselves or conjointly with others,) of the affairs of the association,

and were the actors in doing it. Now, if the bills were illegal, will the law presume that the agents who issued them reclaimed them for illegal objects? And, should the court assume this as a fact, without its being submitted to the action of the jury? I apprehend not, and that the presumption should be, both by court and jury, that the bills were reclaimed and redelivered, for a lawful, rather than an unlawful purpose, viz: that of preventing their circulation, or, perhaps, as the act under which the association was organized, rendered the directors personally liable for its indebtedness, for the purpose of anticipating and obviating such liability. (For, a decision that the act is invalid, as far as it purports to grant corporate powers, does not decide any question in relation to their individual liability under it, or for acts done under color of its authority. And, when the trust was created, no judicial decision had pronounced the act unconstitutional in respect to its grant of corporate powers.) It is, however, urged that the making and delivery of the bills was by the corporation, and the redelivery was to the defendants below as individuals. This argument appears to me suicidal. It assumes, for the purpose of declaring the bills illegal, that there was no corporation, the act being void, and that the agents issuing them were usurping unauthorized powers, and then, for the purpose of making the defendants culpable in receiving them back, that they were well issued in the exercise of corporate powers, and not by them as individual persons. Now, both these propositions cannot be true. If the defendants were corporators in issuing the paper, then the argument as to its illegality has no foundation. If they acted as individuals in doing so, they were doing well in reclaiming them. I do not see any force, in respect to their situation, in the position of counsel, that the association was a corporation *de facto*, if it could be deemed correct. It does not change

the character of the act, or the presumption as to its legality. If they wrongfully delivered the bills, they were right in withdrawing them.

In the second place it was said that the object of the note and trust was illegal.

The bills were held by Welles for indemnity. Upon their surrender, the securities were assigned, and the note in question made. In the declaration of trust, the object secondly stated, is, to apply the moneys collected in payment of the drafts, and indemnify Welles for his acceptances. Assuming that the drafts were themselves illegal for the reasons assigned, is this object of the new agreement and trust illegal? The drafts, it is to be observed, had passed their maturity; they were in the hands of an attorney for collection. Their circulation had ceased. It was not the object of the trust to further or aid this. Nothing of this kind is apparent. The great reason of the rule as to illegal paper, has no application. In construing an instrument, every part is to be viewed, as well as the situation of the parties, and the thing or subject to which it relates. Upon such a view of this instrument, is not the trust in this second provision, for the payment of the money for which these drafts were held, and which had been advanced or paid for them? This would seem to be the better construction, and the legal effect. Such certainly would seem to have been the intent of the parties, and the object in the construction of written instruments is to ascertain the intent and to carry it into effect. *Qui haeret in litera, haeret in cortice.* And, if this be the true view of this trust, then it is within the rule above referred to, and especially within the principle of that class of cases, in which, where upon an illegal contract money has been advanced, a contract to refund it, is valid. If the money had been actually paid to the trustee, it would be literally within the cases cited from Bosanquet & Puller;

and if, in the declaration of trust, the repayment of the consideration of the drafts had been mentioned as the object for the application of the trust moneys, no doubt could have been entertained upon the whole transaction; although the drafts are mentioned, it is the same in substance and legal effect.   And, giving the language of the trust its literal construction, it seems to me the result would be the same.   The drafts having passed maturity, and been dishonored, and indeed placed in process of collection by legal measures, and in the hands of an attorney for that purpose, it was not either the tendency or the object of the trust to promote their circulation, for that had ceased in fact as well as in legal contemplation; much less could its tendency or object have been to have aided, or induced the original alleged making and issuing of them.   And, as it respects Welles, I cannot perceive that, at the time when the trust was created, it was an illegal object to indemnify him, rather than compel him to defend against the drafts.   If they were illegally made and issued originally, as contended, yet, it was indemifying against a past illegal transaction, by means of which the parties creating the trust had been benefitted, and in no manner induced or tended to further or promote that transaction, and is within the principle of the cases above referred to on that point.

We have thus considered the two propositions separately, to wit, the consideration and object of the note and trust.   But they were one transaction, and should, properly, be considered together.   Assuming the bills and drafts to have been illegal paper, the case is this:   The defendants procure the accommodation acceptances of Welles to the drafts, and, for security, deposit with him the bills. The drafts are dishonored, and suit is threatened.   The defendants and Welles, then having notice, in view of the law, (as the counsel insists and we assume,) that the drafts

and bills were illegal, make a new arrangement, and provide the trust set out in this case for payment to the holders of the drafts, of the amount of them, and indemnity of Welles; and receive back the bills.    As to the alleged illegality, they are silent, or waive it, and place the securities in the hands of a trustee unconnected with the original transaction.    This is a new and separate transaction, based upon the fact that the holder of the paper provided for, has advanced for it a full consideration, which in justice and equity ought to be paid ; and I see nothing to taint it with illegality, although the bills and drafts might originally have been illegal from having been made in the usurpation and illegal exercise of corporate and banking powers.    It is insisted, however, that if the drafts were illegal, the presumption which usually attaches by law to negotiable paper, viz : that the holder has paid a valuable and full consideration, does not exist.    Whether it does or does not, is immaterial in the case.    The defendants below, having provided for payment, to the holders, of their full amount, admit, in effect, that such was the fact. And, in the face of this fact, neither court nor jury could presume to the contrary in the absence of further evidence on this point.

This disposes of the first exception.    The second is not insisted on, and I do not see how it could be, if the Farmer's Bank of Homer were no corporation.    It is however er disposed of in disposing of the first.

It is further contended that the court below erred in refusing to charge the jury that the trust was created for indemnity, and the plaintiff was not entitled to recover, unless they believed that Welles had been damnified.    The second provision of the trust is to *collect* and *pay*, and indemnify.    It is not to indemnify merely.    The trustee is required to collect and pay, and this is the mode in which the indemnity is to be effected.    Consequently, he was au-

thorised and required to sue the notes for the objects of the trust, immediately upon default of payment.    The case of *Rice* v. *Wheelock*, 1 Doug. Mich. R. 267, is in point, and decides this question in favor of the plaintiff below.

There is then no error in the judgment of the Circuit Court of the county of Calhoun, and it must be affirmed.
*Judgment affirmed.*